FRANK A. MAGNANIMO
**MAGNANIMO & DEAN, LLP**
21031 Ventura Boulevard
Suite 803
Woodland Hills, CA 91364
Telephone: (818) 305-3450
Facsimile: (818) 305-3451
Email: Frank@MagDeanLaw.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESA PARDOS MILLAN, Derivatively on Behalf of Nominal Defendant FIBROGEN, INC., <br><br> Plaintiff, <br><br> v. <br><br> JAMES A. SCHOENECK, JEFFREY W. HENDERSON, MAYKIN HO, PH.D., BENJAMIN F. CRAVATT, PH.D., JEFFREY L. EDWARDS, RORY B. RIGGS, ENRIQUE CONTERNO, AOIFE BRENNAN, M.B., B.CH., THOMAS F. KEARNS JR., AND GERALD LEMA, <br><br> Defendants, <br><br> FIBROGEN, INC., <br><br> Nominal Defendant. | CASE NO.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

Plaintiff Vanesa Pardos Millan ("Plaintiff"), on behalf of FibroGen Inc. ("FibroGen" or the "Company"), derivatively, alleges the following based upon personal knowledge as to herself and her own acts, and upon information and belief and investigation of counsel as to all other matters.  That investigation included, among other things, a thorough review and analysis of public documents, court filings, press releases and news articles concerning FibroGen, and the other facts as set forth herein:

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of and for the benefit of FibroGen, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties.  Defendants' actions have caused, and will continue to cause, substantial financial harm and reputational damage to FibroGen.

2.     FibroGen is a biopharmaceutical company that develops medicines for the treatment of anemia, fibrotic disease, and cancer.  Its most advanced product is roxadustat, an oral small molecule inhibitor of hypoxia-inducible factor-prolyl hydroxylase ("HIF-PH") activity that acts by stimulating the body's natural pathway for red cell production. In December 2019, the Company filed its New Drug Application ("NDA") with the U.S. Food and Drug Administration ("FDA") for the approval of roxadustat for the treatment of anemia due to chronic kidney disease ("CKD").

3.     On April 6, 2021, the Company issued a statement "provid[ing] clarification of certain prior disclosures of U.S. primary cardiovascular safety analyses from the roxadustat Phase 3 program for the treatment of anemia of chronic kidney disease ('CKD')."  Specifically, the Company stated that the safety analyses "included post-hoc changes to the stratification factors."  The Company further revealed that, based on analyses using the pre-specified stratification factors, the

Company "cannot conclude that roxadustat reduces the risk of (or is superior to) MACE+ in dialysis, and MACE and MACE+ in incident dialysis compared to epoetinalfa."

4. On this news, the Company's share price fell $14.90, or 43%, to close at $19.74 per share on April 7, 2021.

5. Throughout the Relevant Period, Defendants (defined below) made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (i) that certain safety analyses submitted in connection with FibroGen's NDA for roxadustat included post-hoc changes to stratification factors; (ii) that, based on analyses using the pre-specified stratification factors, the Company could not conclude that roxadustat reduces the risk of major adverse cardiovascular events compared to epoetin-alfa; (iii) that, as a result, the Company faced significant uncertainty that its NDA for roxadustat as a treatment for anemia of CKD would be approved by the FDA; and (iv) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

6. Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violation Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

7. The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in California or is an individual who has sufficient minimum contacts with California so as to render the exercise of

jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, including Nominal Defendant FibroGen, a substantial portion of the transactions and wrongs complained of herein – including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to the Company – occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

9.      In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## PARTIES

### Plaintiff

10.      **_Plaintiff Vanesa Pardos Millan_** is a current FibroGen shareholder during the relevant period.  Plaintiff purchased fifty shares of FibroGen stock on March 2, 2021.  Plaintiff will continue to hold FibroGen shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

11.      Nominal Defendant FibroGen is incorporated under the laws of Delaware with its principal executive offices located in San Francisco, California. FibroGen's common stock trades on the NASDAQ exchange under the symbol "FGEN."

### Director Defendants

12.     **_Defendant James A. Schoeneck_** ("Schoenck") was appointed Chairperson of the Board of Directors (the "Board") in January 2020 and has served on the Board since April 2010.  Following the unexpected passing of Thomas B. Neff, the Company's Founder and Chief Executive Officer, Defendant Schoeneck served as Interim Chief Executive Officer from August 2019 until January 2020.

13.     **_Defendant Jeffrey W. Henderson_** ("Henderson") has served on the Board since August 2015.  Defendant Henderson was president and general manager of Eli Lilly Canada Inc. and vice president and corporate controller of Eli Lilly & Company.  Defendant Henderson joined Eli Lilly in 1998 as vice president and corporate treasurer.

14.     **_Defendant Maykin Ho, Ph.D._** ("Ho") joined the Board in December 2018.  Defendant Ho is a member of the Audit Committee.

15.     **_Defendant Benjamin F. Cravatt, Ph.D._** ("Cravatt") was appointed to the Board in August 2020.

16.     **_Defendant Jeffrey L. Edwards_** ("Edwards") was appointed to the Board in 2015.  Defendants Edwards is the Chair of the Audit Committee.

17.     **_Defendant Rory B. Riggs_** ("Riggs") has served on the Board since October 1993.

18.     **_Defendant Enrique Conterno_** ("Conterno") joined the Company as Chief Executive Officer and member of Board in January 2020.  In 2020, Defendant Conterno received a base salary of $800,000 and a target annual cash bonus opportunity equal to 75% of his base salary. Upon commencement of his employment, Defendant Conterno received a sign-on bonus in the amount of $250,000 and was granted a stock option to purchase 300,000 shares of our common stock as well as a restricted stock unit ("RSU") award for 60,000 shares of our common stock.  Defendant Conterno was a Senior Vice President for Eli Lilly and Company, serving as President of Lilly USA from January 2017, and President of

Lilly Diabetes from 2009.  Prior to 2009, Defendant Conterno served in various other roles for Eli Lilly and Company, including President, U.S. Operations, Vice President for the U.S. Neuroscience Business Unit, President and General Manager, Mexico, and Executive Marketing Director, Intercontinental Operations and Japan.

19.    ***Defendant Aoife Brennan, M.B., B.Ch.*** ("Brennan") was appointed to the Board in August 2020.

20.    ***Defendant Thomas F. Kearns Jr.*** ("Kearns") has served on the Board since November 1996.

21.    ***Defendant Gerald Lema*** ("Lema") has served on the Board since September 2017.  Defendant Lema is a member of the Audit Committee.

22.    Defendants Schoenck, Henderson, Ho, Cravatt, Edwards, Riggs, Conterno, Brennan, Kearns, and Lema are collectively referred to herein as "Director Defendants."

## **Audit Committee Charter**

23.    Pursuant to the Company's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board with oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements.

24.    The Audit Committee Charter states in relevant part:

**RESPONSIBILITIES**

The Committee's responsibility is one of oversight. The members of the Audit Committee are not employees of the Company, and they do not perform, or represent that they perform, the functions of management or the Auditors.  The Committee relies on the expertise and knowledge of management, the internal auditor and the Auditors in carrying out its oversight responsibilities. The management of the Company is responsible for preparing accurate and complete financial statements in accordance with generally accepted accounting principles ("GAAP"), preparing periodic reports and for establishing and maintaining

appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The Auditors are responsible for auditing the Company's annual consolidated financial statements and the effectiveness of the Company's internal control over financial reporting and reviewing the Company's quarterly financial statements. It is not the responsibility of the Committee to prepare or certify the Company's financial statements, guarantee the audits or reports of the Auditors or ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP or otherwise comply with applicable laws.

The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and responsibilities with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock may be listed) deviate from these activities as appropriate under the circumstances:

1.    **Evaluation and Retention of Auditors**. To evaluate the performance of the Auditors, to assess their qualifications (including their internal quality control procedures and any material issues raised by that firm's most recent internal quality control review or any investigations by regulatory authorities) and to determine whether to retain, or to terminate, the engagement of the existing Auditors, or to appoint and engage a different independent registered public accounting firm, which retention shall be subject only to ratification by the Company's stockholders (if the Committee or Board elects to submit such retention for ratification by the stockholders).

2.    **Communication Prior to Engagement**. Prior to engagement of any prospective Auditors, to review a written disclosure by the prospective Auditors of all relationships between the prospective

Auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence, and to discuss with the prospective Auditors the potential effects of such relationships on the independence of the prospective Auditors, consistent with Ethics and Independence Rule 3526, Communication with Audit Committees Concerning Independence ("Rule 3526"), of the Public Company Accounting Oversight Board (United States) (the "PCAOB").

3.     **Approval of Audit Engagements**. To determine and approve engagements of the Auditors, prior to commencement of such engagements, to perform all proposed audit, review and attest services, including the scope of and plans for the audit, the adequacy of staffing, the compensation to be paid, at the Company's expense, to the Auditors and the negotiation and execution, on behalf of the Company, of the Auditors' engagement letters, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

4.     **Approval of Non-Audit Services**. To determine and approve engagements of the Auditors, prior to commencement of such engagements (unless in compliance with exceptions available under applicable laws and rules related to immaterial aggregate amounts of services), to perform any proposed permissible non-audit services, including the scope of the service and the compensation to be paid therefor, at the Company's expense, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

5.     **Audit Partner Rotation**. To monitor the rotation of the partners of the Auditors on the Company's audit engagement team as required by applicable laws, rules and guidelines, and to consider periodically and, if deemed appropriate, adopt a policy regarding rotation of auditing firms.

6.     **Auditor Independence**. At least annually, consistent with Rule 3526, to receive and review written disclosures from the Auditors delineating all relationships between the Auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence and a letter from the Auditors affirming their independence, to consider and discuss with the Auditors any potential effects of any such relationships on the independence of the Auditors as well as any compensation or services that could affect the Auditors' objectivity and independence, and to assess and otherwise take appropriate action to oversee the independence of the Auditors.

7.     **Former Employees of Auditors**. To consider and, if deemed appropriate, adopt policies regarding Committee preapproval of employment by the Company of individuals employed or formerly employed by the Company's Auditors and engaged on the Company's account.

8.     **Audited Financial Statement Review**. To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and any disclosure from the Company's CEO and CFO to be made in connection with the certification thereof, and to recommend whether or not such financial statements should be so included.

9.     **Annual Audit Results**. To review with management and the Auditors, the results of the annual audit, including the Auditors' assessment of the quality of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements), all material findings, including misstatements and weaknesses, if any, the adequacy of the disclosures in the financial statements, and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB. To review with management and inquire of the CEO, CFO, controller, Director of Internal Audit or any other persons requested by the Committee, regarding the subjective and objective quality and integrity of the Company's financial statements and earnings.

10.     **Auditor Communications**. At least annually, to discuss with the Auditors the matters required to be discussed by Auditing Standard 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB).

11.     **Quarterly Results and Reports on Form 10-Q**. To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements and any disclosure from the Company's CEO and CFO to be made in connection with the certification of the Company's quarterly reports filed with the SEC, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB. To review with management and the Auditors, to the extent appropriate, other relevant reports or financial information submitted by the Company to any governmental body or the public, including management certifications as required in Item 601(b)(31) of Regulation S-K and relevant reports rendered by the Auditors (or summaries thereof)

12.     **Management's Discussion and Analysis**. To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports and other filing with the SEC.

13.     **Press Releases**. To review with management and the Auditors, to the extent appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information), which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

14.     **Accounting Principles and Policies**. To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under GAAP related to material items discussed with management, the potential impact on the Company's financial statements

of off-balance sheet structures and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

15.     **Risk Assessment and Management**. To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to financial risk management and financial risk assessment, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

16.     **Management Cooperation with Audit**. To evaluate the cooperation received by the Auditors during their audit examination, including any significant difficulties encountered during the audit or any restrictions on the scope of their activities or access to required records, data and information and, whether or not resolved, significant disagreements with management and management's response, if any.

17.     **Management Letters**. To review with the Auditors and, if appropriate, management, any "management" or "internal control" letter issued or, to the extent practicable, proposed to be issued by the Auditors and management's response, if any, to such letter, as well as any additional material written communications between the Auditors and management.

18.     **Internal Auditors**. Review the audit plan of the Company's Internal Audit Department to the extent established (the "Internal Auditors"), discuss scope, staffing, compensation, locations, reliance upon management and general audit approach and any significant reports prepared by the Internal Auditors as well as management's responses, approve the hiring and dismissal of the Director of Internal Audit, periodically (no less frequently than annually) approve, review and recommend changes to the Internal Auditors' Charter to ensure that the function has guidelines that allow it to operate effectively, and ensure that the Director of Internal Audit (and those reporting to the Director of Internal Audit on internal audit matters) has access to the Company's records as necessary to permit the function to operate effectively. To periodically review with the Auditors, the Internal Auditors' responsibility, budget and staffing. To discuss, with the Auditors and management, the Internal Auditors' function and the extent to which

changes or improvements in financial or accounting practices have been implemented.

19. **National Office Communications**. To review with the Auditors, as appropriate, communications between the audit team and the Auditors' national office with respect to accounting or auditing issues presented by the engagement.

20. **Disagreements Between Auditors and Management**. To review with management and the Auditors, or any other registered public accounting firm engaged to perform review or attest services, any conflicts or disagreements between management and the Auditors, or such other accounting firm, whether or not resolved, regarding financial reporting, accounting practices or policies or other matters, that individually or in the aggregate could be significant to the Company's financial statements or the Auditors' report, and to resolve any conflicts or disagreements regarding financial reporting.

21. **Internal Control over Financial Reporting; Disclosure Controls**. To confer with management, the Director of Internal Audit, if any, and the Auditors, as appropriate, regarding the scope, adequacy, and effectiveness of internal control over financial reporting, including computerized information system controls and security, and the Company's disclosure controls and procedures, including any significant deficiencies and significant changes in internal controls. To obtain reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

22. **Separate Sessions**. Periodically, to meet in separate sessions with the Auditors, the Internal Auditors or other personnel responsible for the internal audit function, as applicable and appropriate, and management to discuss any matters that the Committee, the Auditors, the Internal Auditors or other personnel responsible for the internal audit function, or management believe should be discussed privately with the Committee.

23. **Correspondence with Regulators**. To consider and review with management, the Auditors, outside counsel, as appropriate, and any special counsel, separate accounting firm or other consultants and advisors as the Committee deems appropriate, any correspondence with

regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

24.      **Complaints**. To establish procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company, and to review the facts, analysis and status of any complaints or violations regarding accounting, internal accounting controls or auditing matters, the Company's Code of Conduct and Ethics, or any anti-bribery or anti-corruption policy, and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

25.      **Engagement of Registered Public Accounting Firms**. To determine and approve engagements of any registered public accounting firm (in addition to the Auditors), prior to commencement of such engagements, to perform any other review or attest service, including the compensation to be paid, at the Company's expense, to such firm and the negotiation and execution, on behalf of the Company, of such firm's engagement letter, which approval may be pursuant to preapproval policies and procedures, including the delegation of preapproval authority to one or more Committee members, so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

26.      **Ethical Compliance**. To review with management, including the Company's general counsel and Director of Internal Audit, if any, the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Business Conduct and Ethics, including review and oversight of related-party transactions as required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock is listed.

27.      **Investigations**. To investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

28.      **Information Technology Security; Cybersecurity**. At least annually, to review and assess the adequacy of the Company's policies regarding information technology security and cybersecurity.

29.     **Director and Officer Insurance**. To review and approve the Company's director and officer insurance policy. The chairperson of the Committee shall report to the Board the results of the Committee's review.

30.     **Delegation of Authority to Officers and Employees**. To periodically review and assess the delegation of preapproval authority to the Company's officers and employees, including their authority to enter into agreements and obligations on behalf of the Company up to certain threshold dollar amounts for each applicable employee levels, and to recommend changes to the Board of the delegation of preapproval authority to the Company's officers and employees as necessary or appropriate.

31.     **Related Party Transactions**. Consider and approve or disapprove any related party transaction as defined under SEC Regulation S-K Item 404, to the extent required by SEC regulations.

32.     **Proxy Report**. To oversee the preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

33.     **Annual Charter Review**. To review and assess the adequacy of this charter annually and recommend any proposed changes to the Board for approval, including as may be necessary to comply with any applicable or newly enacted laws, rules or regulations.

34.     **Report to Board**. To report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the Auditors, the performance of the Company's internal audit function (as applicable) or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

35.     **Internal Control Report**. At least annually to obtain and review a report by the Auditors describing that firm's internal quality-control review or peer review or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, with respect

to one or more independent audits performed by the firm, as well as any steps taken to address the issues raised.

36.   **Annual Committee Evaluation**. To conduct an annual evaluation of the performance of the Committee.

37.   **Other Legal and Finance Matters**. To review, with the Company's counsel, legal compliance and legal matters that could have a significant impact on the Company's financial statements. To review, with management, the Company's finance function, including its budget, organization and quality of personnel.

38.   **General Authority**. To perform such other functions and to have such powers as may be necessary or appropriate in the discharge of any of the foregoing.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

25.   On November 8, 2019, the Company announced "Positive Phase 3 Pooled Roxadustat Safety and Efficacy Results" in a press release that stated:

[The Company] today announced results from the pooled analyses of data from six global pivotal Phase 3 trials investigating roxadustat, a first-in-class, orally-administered inhibitor of hypoxia-inducible-factor (HIF) prolyl hydroxylase activity. The pooled analyses assessed the safety and efficacy of roxadustat as a treatment for anemia in chronic kidney disease (CKD) compared to placebo in Non-Dialysis-Dependent (NDD) patients and to standard of care epoetin alfa in Dialysis-Dependent (DD) patients, including the clinically important Incident Dialysis (ID) patient subgroup. These Phase 3 trials conducted by FibroGen and collaboration partners AstraZeneca and Astellas Pharma, Inc., enrolled over 8,000 CKD patients from more than 50 countries.

"The pooled safety analyses assessing roxadustat as a treatment for anemia in chronic kidney disease demonstrate a cardiovascular safety profile comparable with placebo in patients not on dialysis, and comparable or in some cases better than that of epoetin alfa in patients on dialysis," said Robert Provenzano, MD, Associate Professor of Medicine, Wayne State University, Detroit, Michigan, U.S. and a primary investigator on the global Phase 3 program. "It is exciting to see this application of the groundbreaking science on oxygen sensing and

adaptation to hypoxia recently awarded the 2019 Nobel Prize in Physiology or Medicine, and championed by FibroGen's late founder and CEO, Tom Neff, who sadly passed away earlier this year. These positive safety results, coupled with roxadustat's well-defined efficacy in CKD patients, and its oral formulation, support the potential for roxadustat to become an important new treatment option for patients with anemia associated with CKD."

These late-breaking data were featured in the High-Impact Clinical Trials oral abstract session on Friday, November 8, at the American Society of Nephrology Kidney Week 2019 in Washington, D.C. (Presentation FR-OR131).

* * *

Cardiovascular (CV) endpoints were defined as:

- Time to first Major Adverse Cardiovascular Event (MACE): a composite endpoint of all-cause mortality, myocardial infarction, stroke;

- Time to first MACE+, a composite endpoint which includes MACE plus unstable angina and heart failure requiring hospitalization; and

- Time to all-cause mortality

o   In the Non-Dialysis Dependent (NDD) patient population: § Risks of MACE, MACE+, and all-cause mortality in roxadustat patients were comparable to placebo in the ITT analyses based on a reference non-inferiority margin of 1.3. [image omitted]

o   In a post hoc subgroup analysis of 2,438 non-dialysis patients with baseline eGFR≥15, § The one-year decline in eGFR in roxadustat treated patients (-2.8) was significantly less than that in placebo treated patients (-4.4), with a treatment difference of 1.6 mL/min/1.73m2 (p<0.0001).

o   In the Dialysis Dependent (DD) patient population:

- Risks of MACE and all-cause mortality in roxadustat patients were not increased compared to those for patients receiving epoetin alfa based on a reference non-inferiority margin of 1.3.

- Risk of MACE+ was 14% lower in roxadustat-treated patients than in those receiving epoetin alfa. [image omitted]

- The Incident Dialysis (ID) patient sub-group of the Dialysis Dependent (DD) patient population:

  • Risk of MACE was 30% lower in roxadustat patients than in epoetin alfa patients, and risk of MACE+ was 34% lower.
  • Roxadustat-treated patients' risk showed a trend towards lower all-cause mortality relative to epoetin alfa-treated patients.

26. On December 23, 2019, the Company announced that it had submitted its NDA for roxadustat to the FDA. In a press release, the Company stated:

FibroGen, Inc. (NASDAQ: FGEN), today announced the submission of a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) for Roxadustat for the treatment of anemia of chronic kidney disease (CKD), in both non-dialysisdependent (NDD) and dialysis-dependent (DD) CKD patients.

Roxadustat is the first orally administered small molecule hypoxia-inducible factor prolyl hydroxylase (HIF-PH) inhibitor submitted for FDA regulatory approval for the treatment of anemia of CKD. Regulatory approval of roxadustat is supported by positive results from a global Phase 3 program encompassing 15 trials that enrolled more than 10,000 patients, worldwide.

"The submission of this NDA is a major step toward our goal of bringing this novel oral medicine to U.S. patients suffering from anemia in CKD," said Jim Schoeneck, Interim Chief Executive Officer, FibroGen. "We, in collaboration with our partner AstraZeneca, look forward to working with the FDA during the NDA review, and to the potential of roxadustat

as a new therapeutic option for treating CKD anemia, in patients on dialysis and not on dialysis."

27.    On February 11, 2020, the Company announced that the FDA has completed its filing review of the NDA.  In a press release, the Company stated:

> FibroGen, Inc. (NASDAQ: FGEN) today announced that the U.S. Food and Drug Administration (FDA) has completed its filing review of its New Drug Application (NDA) for roxadustat for the treatment of anemia of chronic kidney disease (CKD), in both non-dialysis-dependent (NDD) and dialysis-dependent (DD) patients.  The application will be considered filed on February 18, 2020.

> The FDA has set a Prescription Drug User Fee Act (PDUFA) date of December 20, 2020.  "The FDA's acceptance of the roxadustat new drug application is a critical step towards providing a new treatment option in the United States for chronic kidney disease patients suffering from anemia, a serious and often life-threatening disease," said Enrique Conterno, Chief Executive Officer, FibroGen.

> "There is significant unmet medical need for patients with anemia of CKD, who have seen only limited advances in the last three decades," said Peony Yu, M.D., Chief Medical Officer, FibroGen. "We intend to work closely with the FDA, in collaboration with our partner, AstraZeneca, to make this novel oral therapy available as soon as possible."

> The filing of the roxadustat NDA triggers a $50 million milestone payment from AstraZeneca (LSE/STO/NYSE: AZN) to FibroGen.

28.    On December 18, 2020, the Company issued a press release announcing that the FDA had extended the review period for the NDA by three months.  The Company stated:

> FibroGen, Inc. (Nasdaq: FGEN) today announced that the U.S. Food and Drug Administration (FDA) has extended the review period of the New Drug Application (NDA) for roxadustat for the treatment of anemia of chronic kidney disease (CKD) by three months. The updated Prescription Drug User Fee Act (PDUFA) action date is March 20, 2021.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

18

The FDA is close to finalizing its review of the NDA and FibroGen is submitting additional analyses of existing roxadustat clinical data, which require an extension of the original PDUFA date.

"FibroGen is working closely with the FDA, in collaboration with our partner, AstraZeneca, to support the final review of the new drug application for roxadustat," said Enrique Conterno, Chief Executive Officer, FibroGen. "There is significant unmet medical need for the treatment of anemia of CKD, and we are committed to bringing roxadustat to patients in the U.S. as soon as possible.

29.    The above statements identified in ¶¶ 25-28were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Defendants failed to disclose that: (i) certain safety analyses submitted in connection with FibroGen's NDA for roxadustat included post-hoc changes to stratification factors; (ii) based on analyses using the pre-specified stratification factors, the Company could not conclude that roxadustat reduces the risk of major adverse cardiovascular events compared to epoetin-alfa; (iii) as a result, the Company faced significant uncertainty that its NDA for roxadustat as a treatment for anemia of CKD would be approved by the FDA; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

30.    On April 6, 2021, the Company issued a statement "provid[ing] clarification of certain prior disclosures of U.S. primary cardiovascular safety analyses from the roxadustat Phase 3 program for the treatment of anemia of chronic kidney disease ('CKD')."   The Company stated that the safety analyses "included post-hoc changes to the stratification factors."   The Company further revealed that, based on analyses using the pre-specified stratification factors, it "cannot conclude

that roxadustat reduces the risk of (or is superior to) MACE+ in dialysis, and MACE and MACE+ in incident dialysis compared to epoetinalfa."  The Company stated:

> FibroGen, Inc. (Nasdaq: FGEN) (the "Company") today provided clarification of certain prior disclosures of U.S. primary cardiovascular safety analyses from the roxadustat Phase 3 program for the treatment of anemia of chronic kidney disease ("CKD").
>
> "As members of senior management were preparing for the upcoming FDA Advisory Committee meeting, we became aware that the primary cardiovascular safety analyses included post-hoc changes to the stratification factors," said Enrique Conterno, Chief Executive Officer, FibroGen. "While all of the analyses set forth below, including the differences in the stratification factors, were included in the NDA, we promptly decided to clarify this issue with the FDA and communicate with the scientific and investment communities."
>
> Mr. Conterno continued, "It is important to emphasize that this does not impact our conclusion regarding the comparability, with respect to cardiovascular safety, of roxadustat to epoetin-alfa in dialysis-dependent (DD) patients and to placebo in nondialysis dependent (NDD) patients. We continue to have confidence in roxadustat's benefit risk profile.
>
> * * *
>
> The table below describes the cardiovascular safety results using the post-hoc stratification factors reported at the American Society of Nephrology conference in November 2019, as well as the analyses with the pre-specified stratification factors which have not been previously publicly reported.

| | Analyses with post-hoc stratification factors | Analyses with pre-specified stratification factors |
|---|---|---|
| | HR (95% Confidence Interval) | HR (95% Confidence Interval) |
| **Non Dialysis** (OLYMPUS, ANDES, ALPS N=4,270); ITT | | |
| MACE | 1.08 (0.94, 1.24) | 1.10 (0.96, 1.27) |
| MACE+ | 1.04 (0.91, 1.18) | 1.07 (0.94, 1.21) |
| ACM | 1.06 (0.91, 1.23) | 1.08 (0.93, 1.26) |
| **Dialysis Dependent** (HIMALAYAS, SIERRAS, ROCKIES  N=3,880); OT-7 | | |
| MACE | 0.96 (0.82, 1.13) | 1.02 (0.88, 1.20) |
| MACE+ | 0.86 (0.74, 0.98) | 0.91 (0.80, 1.05) |
| ACM | 0.96 (0.79, 1.17) | 1.02 (0.84, 1.23) |
| Incident Dialysis (N=1,526); OT-7 | | |
| MACE | 0.70 (0.51, 0.96) | 0.82 (0.60, 1.11) |
| MACE+ | 0.66 (0.50, 0.89) | 0.78 (0.59, 1.02) |
| ACM | 0.76  (0.52, 1.11) | 0.82 (0.57, 1.18) |

As reflected in the table, the analyses with the pre-specified stratification factors result in higher hazard ratios (point estimates of relative risk) and 95% confidence intervals. For MACE+ in dialysis and for MACE and MACE+ in incident dialysis, the 95% confidence intervals include 1.0. ***While these hazard ratios remain below 1.0, based on these analyses we cannot conclude that roxadustat reduces the risk of (or is superior to) MACE+ in dialysis, and MACE and MACE+ in incident dialysis compared to epoetin-alfa***.  (Emphasis added).

31.    On this news, the Company's share price fell $14.90, or 43%, to close at $19.74 per share on April 7, 2021.

## DUTIES OF DEFENDANTS

32.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

33.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the

administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

34.     Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

35.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

36.    Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37.    Each director and officer of the Company owed to the Company the fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

38.     Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.  Defendants subjected the Company to the costs of defending and the potential liability from a class action lawsuit for violations of the federal securities laws.  As a result, the Company has expended, and will continue to expend, significant sums of money.

39.     Defendants' actions have irreparably damaged the Company's corporate image and goodwill.

## DEMAND FUTILITY ALLEGATIONS

40.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

41.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company because of the breaches of fiduciary duty by Defendants.

42.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board of the Company to institute this action against Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

43.     The Board is currently comprised of Schoenck, Henderson, Ho, Cravatt, Edwards, Riggs, Conterno, Brennan, Kearns, and Lema.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, *five* (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

44.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with the Company, Defendants had knowledge

of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

45.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for Company shareholders.

46.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and is excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

47.     Any suit by the Board to remedy these wrongs would likely expose the Company to further violations of the securities laws that would result in civil actions being filed; thus, the Board members are hopelessly conflicted in making any supposedly independent determination about whether to sue themselves.

48.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

49.     Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## **DEFENDANTS ARE NOT INDEPENDENT**

**Defendant Conterno**

50.    Defendant Conterno is the CEO of the Company.  Defendant Conterno is also a Director of the Company.

51.    Defendant Conterno is not disinterested or independent, and therefore, is incapable of considering demand because Conterno (as CEO) is an employee of the Company who derived substantially all of his income from his employment with the Company, making him not independent.  As such, Conterno cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

52.    In 2020, Defendant Conterno received a base salary of $800,000 and a target annual cash bonus opportunity equal to 75% of his base salary.  Upon commencement of his employment, Defendant Conterno received a sign-on bonus in the amount of $250,000 and was granted a stock option to purchase 300,000 shares of our common stock as well as a restricted stock unit award for 60,000 shares of our common stock.

53.    This lack of independence and financial benefits received by Defendant Conterno renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

54.    Defendant Conterno is also a defendant in the securities class actions entitled *Grazioli v. Fibrogen, Inc., et al.*, Case 3:21-cv-03212 (N.D. Cal.); *Gutman v. Fibrogen, Inc. et al.*, Case 3:21-cv-02725 (N.D. Cal.); *Leonard v. Fibrogen, Inc., et al.*, Case 5:21-cv-03370-BLF (N.D. Cal.) and *Xu v. Fibrogen, Inc., et al.*, Case 3:21-cv-02623 (N.D. Cal.) (the "Securities Class Actions").

**Defendants Edwards, Ho and Lema**

55.    Defendants Edwards, Ho and Lema served as members of the Audit Committee during the Relevant Period.  Pursuant to the Audit Committee Charter,

the Audit Committee Defendants were responsible for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management and legal and regulatory compliance that may affect the Company's financial reporting.  Defendants Edwards, Ho and Lema failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter and to issue false and misleading financial statements with the SEC.  Thus, Defendants Edwards, Ho and Lema breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendants Conterno and Henderson**

56.     Defendants Conterno and Henderson have extensive, longstanding business releationship, which preclude them from acting independently and in the best interests of the Company and the shareholders.  Defendants Conterno and Henderson held executive positions at Eli Lilly.

**Defendant Schoeneck**

57.     Defendant Schoeneck has received and continues to receive substantial compensation for his role as a director.  As a trusted Company director, Defendant Schoeneck conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

58.     Further, Defendant Schoeneck is also a defendant in the Securities Class Actions.

## FIRST CAUSE OF ACTION

### (Against Defendants For Breach of Fiduciary Duty)

59.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

60.     Defendants owed and owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

61.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

62.     Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

63.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant and actual damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

64.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

### SECOND CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment)

65.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

66.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of the Company in the form of salaries, bonuses, and other forms of compensation.

67.     Plaintiff, as a shareholder and representatives of the Company, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### THIRD CAUSE OF ACTION

### (Against Defendants for Abuse of Control)

68.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

69.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

70.     As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

71.     As a result of the misconduct alleged herein, Defendants are liable to the Company.  Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (Against Defendants for Waste of Corporate Assets)

72.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

73.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by failing to disclose (i) the Company had a material weakness in its internal control over financial reporting; (ii) the Company's disclosure controls and procedures were not effective; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

74.     Further, during the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose or deliberately disregarded: (i) that certain safety analyses submitted in connection with FibroGen's NDA for roxudustat included post-hoc changes to stratification factors; (ii) that, based on analyses using the pre-specified stratification factors, the

Company could not conclude that roxadustat reduces the risk of major adverse cardiovascular events compared to epoetin-alfa; (iii) that, as a result, the Company faced significant uncertainty that its NDA for roxadustat as a treatment for anemia of CKD would be approved by the FDA; and (iv) that, as a result of the foregoing, Defendants' positive statements about the Company's business operations, and prospects were materially misleading and/or lacked a reasonable basis.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

75.     As a result of the waste of corporate assets, Defendants are each liable to the Company.

76.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

### FIFTH CAUSE OF ACTION
#### (Against Defendants Conterno and Schoeneck for Violations of Sections 10(b) and 21D Of The Exchange Act)

77.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.     The Company, along with Defendants Conterno and Schoeneck are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of law, the Company's liability will be in whole or in part due to Defendants Conterno and Schoeneck's willful and/or reckless violations of their obligations as officers and directors of the Company.

79.     Through their positions of control and authority as officers of the Company, Defendants Conterno and Schoeneck were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the

Company, including the wrongful acts described in the Securities Class Action and herein.

80.     As such, Defendants Conterno and Schoeneck are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff pray for relief and judgment as follows:

A.     Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, waste of corporate assets and violations of Sections 10(b) and 21D of the Exchange Act;

B.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

C.     Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July __30__, 2021

**MAGNANIMO & DEAN, LLP**

By: _____
     FRANK A. MAGNANIMO
     21031 Ventura Boulevard
     Suite 803
     Woodland Hills, CA 91364

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Telephone: (818) 305-3450
Facsimile: (818) 305-3451
Email: Frank@MagDeanLaw.com

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **VERIFICATION**

I, VANESA PARDOS MILLAN, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of FibroGen, Inc. and authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of FibroGen, Inc. common stock at all relevant times.

_____
VANESA PARDOS MILLAN